STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, ss.                                    DKT. NO. CV-17-4

KELDA SUE ROSE,                          )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        **ORDER**
                                         )
EASTERN MAINE MEDICAL CENTER             )
and ACADIA HOSPITAL CORP.,               )
                                         )
        Defendants.                      )

Defendants Eastern Maine Medical Center (EMMC) and Acadia Hospital Corporation (Acadia) move for summary judgment on all claims in Plaintiff Kelda Sue Rose's complaint. Ms. Rose's complaint alleges that EMMC refused to reasonably accommodate her disability when it did not accept her request to return to the Cardiac Operating Room (COR), where she had once worked. She also alleges that she was terminated from her position in the Clinical Education Department (CED) at EMMC due to her disability. Ms. Rose further alleges that Acadia discriminated against her by withdrawing its offer to work as a nurse because of her disability.

Synthesizing the arguments in Acadia and EMMC's motion, and Ms. Rose's opposition, the issues in Ms. Rose's complaint and on this motion are as follows: (1) whether EMMC's decision to not allow Ms. Rose to return to work in the COR was a refusal to provide a reasonable accommodation or a separate act of disability discrimination; (2) whether Acadia's withdrawal of a conditional offer of employment was an act of disability discrimination, and whether Acadia failed to reasonably accommodate Ms. Rose; (3) whether reextending her the offer for the position for the evening shift instead of the day shift was an act of disability discrimination; (4) whether Ms. Rose was discharged from the CED in May 2015 when EMMC would not return Ms. Rose to the CED after the Acadia offer was withdrawn; and (5) whether EMMC failed to reasonably accommodate Ms. Rose by not returning her to the CED after the Acadia offer was withdrawn. Acadia and EMMC's motion

1

generated extensive memoranda of law and statements of material facts.[1] The Court has reviewed the voluminous record and the parties' respective arguments. It issues the following decision.

## FACTS

What follows is a summary of the properly supported facts in the summary judgment record, viewed in the light most favorable to Ms. Rose as the non-moving party.[2]

1. **Facts Pertaining to Ms. Rose's Work at EMMC as a Traveling Nurse.**

In early 2013, Ms. Rose worked as a traveling nurse for a staffing agency and was assigned to work in the COR at EMMC from March through August 2013. (Def.s' S.M.F. ¶¶ 1-2.) Gwen Ouellette worked with Ms. Rose in the COR unit during that assignment in 2013 and, in Ms. Ouellette's opinion from working with Ms. Rose then, Ms. Rose was unreliable in terms of scheduling.[3] (Def.s' S.M.F. ¶¶ 3-4.) Ms. Ouellette recalls that Ms. Rose called out of scheduled shifts on a number

---

[1] Ms. Rose requested that the Court deny the motion solely on the basis of the number of statements of material fact (216) supplied in support of the motion. The Court declines to do so, though it is aware that the Law Court has questioned the use of summary judgment practice with expansive statements of material fact. *See Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 2 n.3, 45 A.3d 722. Though the record is extensive, the ultimate question is whether there are material disputes of fact that prevent Defendants from obtaining judgment as a matter of law.

[2] In a number of instances, Ms. Rose "denied" or "qualified" facts with assertions that properly belong in a statement of additional facts because the assertions are extraneous and non-responsive to the assertion at issue, and do not go directly to the substance of the asserted material fact. *See Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 11 & n.4, 824 A.2d 48. As further evidence of her statement of additional facts being the proper place for such assertions, she also included many of these "denying" or "qualifying" assertions in her statement of additional facts. They are properly viewed through Ms. Rose's statement of additional facts to determine whether the record as a whole generates a *material* factual dispute on the particular issues here. The Court is not going to note each instance (unless necessary for clarity) for which this occurred, but it should be apparent to the parties when the Court is considering a "denied" or "qualified" fact as admitted pursuant to Rule 56(h)(4) because of extraneous and non-responsive information only proper in the statement of additional facts. The facts are recited with the foregoing in mind.

[3] Ms. Rose vehemently denies that she was unreliable in terms of scheduling in the COR before February 2014. (Pl.'s S.A.M.F. ¶¶ 218-223.) February 2014 is when Ms. Rose sustained a serious back injury. (Pl.'s S.A.M.F. ¶ 226.) Whether Ms. Rose was reliable or not in the COR before her back injury is of great dispute between the parties on this motion. (Def.s' S.M.F. ¶¶ 7-9, 17; Pl.'s Denial of Def.s' S.M.F. ¶¶ 7-9, 17.) Notably, Ms. Rose conceded to at least some of these instances. (Def.s' S.M.F. ¶¶ 5, 16, 35.) Nonetheless, Ms. Ouellette's perception of Ms. Rose's unreliability is a different matter than whether Ms. Rose was actually unreliable. As will become apparent later, Ms. Ouellette's perception of Ms. Rose's work in the COR is what was communicated to an EMMC decisionmaker.

2

of occasions, and she also recalls that there were multiple times Ms. Rose either showed up late for a shift or left a shift early. (Def.s' S.M.F. ¶¶ 5-6.) Ms. Rose, for her part, has no memory of showing up late multiple times, and the only times she can recall leaving a shift early was when she was asked to leave early by EMMC due to a lack of work. (Pl.'s S.A.M.F. ¶ 219.) Eventually, following a several month period of back and forth regarding whether she wanted full-time employment at EMMC, Ms. Rose accepted a Staff Nurse position at EMMC around December 2, 2013, and was assigned primarily to the cardiac surgery unit. (Def.s' S.M.F. ¶¶ 10-16, 18-31.)

2. **Facts Pertaining to Ms. Rose's Employment at EMMC, Injury, and Voluntary Re-Assignment.**

In December 2013, Ms. Rose began working as a Staff Nurse in EMMC's COR unit. (Def.s' S.M.F. ¶ 32.) Gwen Ouellette continued to work with Ms. Rose after she became an EMMC employee, into the early part of 2014. (Def.s' S.M.F. ¶ 34.) Ms. Ouellette recalls that on January 7, 2014, she received a text message from Ms. Rose in which Ms. Rose stated she could not attend a scheduled shift because she was sick and suspected she had carbon monoxide poisoning. (Def.s' S.M.F. ¶ 35.) Around January 29, 2014, Ms. Rose inquired with Ms. Letellier, who was EMMC's Director of Perioperative Services at the time, about the possibility of transferring from the COR to a team lead position in the Outpatient Surgery Center. (Def.s' S.M.F. ¶¶ 10, 33.)

Then, on February 5, 2014, Ms. Rose injured her back in a slip-and-fall accident in EMMC's parking lot. (Def.s' S.M.F. ¶ 36.) She was diagnosed with ruptures of her C-4-5, C-5-6, and T-8-9 discs. (Pl.'s S.A.M.F. ¶ 226.) The vast majority, if not all, of Ms. Ouellette's experience working as a nurse in the COR unit took place in 2013 and the very early part of 2014, before Ms. Rose's injury. (Def.s' S.M.F. ¶ 37.) Ms. Ouellette does not even recall if she worked with Ms. Rose in the COR unit after Ms. Rose's February 5, 2014 injury, though Ms. Rose contends the two did work together in the COR multiple times after her injury. (Def.s' S.M.F. ¶ 38; Pl.'s S.A.M.F. ¶ 228.)

Immediately following her accident on February 5, Ms. Rose missed approximately two days

of work. (Def.s' S.M.F. ¶ 39.) Ms. Rose then went back to work for a few days, and then was out of work for her injury for approximately a few weeks to a month. (Def.s' S.M.F. ¶ 40.) Ms. Rose returned from her leave on a reduced-hours basis. (Def.s' S.M.F. ¶ 41.) After her injury, she could not work every scheduled shift in the COR and had to take intermittent disability leave. (Pl.'s S.A.M.F. ¶ 240.) Eventually, in order to accommodate her back injury, Ms. Rose voluntarily sought and was granted transfers out of the cardiac surgery unit to other positions and practices within EMMC. (Def.s' S.M.F. ¶ 42.) For instance, Ms. Rose spent time working at EMMC's Hampden Family Practice and the Eye Center. (Def.s' S.M.F. ¶ 43.)

In the summer of 2014, Ms. Rose applied for and was granted a transfer to a Staff Developer position within EMMC's CED. (Def.s' S.M.F. ¶ 44.) Ms. Rose applied for the Staff Developer position because of the back pain she had been experiencing, and because the Staff Developer position was less stressful and physically demanding than working in the operating room at that time. (Def.s' S.M.F. ¶ 45.) Ms. Rose began working as a Staff Developer in the CED on August 3, 2014. (Def.s' S.M.F. ¶ 46.) By late November or early December, Ms. Rose had to take occasional disability-related leave from her position as her body continued to heal from the injuries to all three discs. (Pl.'s S.A.M.F. ¶ 229.)

In approximately mid-February 2015, Ms. Rose began inquiring about returning to work in her old position as a cardiac surgery nurse in the COR. (Def.s' S.M.F. ¶ 47; Pl.'s S.A.M.F. ¶ 232.) On or about March 3, Ms. Rose emailed Ms. Letellier to inform her that she (Ms. Rose) had applied for a Service Line Assistant Manager position that the department had posted. (Def.s' S.M.F. ¶ 50.) Ms. Rose stated in her March 3 email to Ms. Letellier that while she gained valuable skills and experience as a Staff Developer in the CED, her "passion . . . has always been for the operating room." (Def.s' S.M.F. ¶ 51.) Ms. Rose's March 3 email to Ms. Letellier further stated that her back injury had "healed" and that she had been "released from Workers Compensation to unrestricted duty." (Def.s' S.M.F. ¶

4

52.) She further stated that she was "back to running 3 miles a day, practicing yoga and barre pilates and [would] be joining the Hampden ATA Martial Arts as soon as we [got] completely moved into our new house in Winterport." (Def.s' S.M.F. ¶ 53.) Ms. Rose emailed Ms. Letellier again on March 12 to reiterate that she was interested in discussing opportunities in the COR. (Def.s' S.M.F. ¶ 54.) Ms. Rose's March 12 email stated, "you can take the girl out of the OR but you can't take the OR out of the girl! I'm back on my game and really want to get back either to cardiac or one of the assistant nurse manager of a service line position. Either way, I know I thrive best within the walls of an operating room." (Def.s' S.M.F. ¶ 55.)

On March 16, Ms. Rose again emailed Ms. Letellier to inform her that she (Ms. Rose) had applied for three positions in the COR department. (Def.s' S.M.F. ¶ 56.) In her March 16 email to Ms. Letellier, Ms. Rose asked if she could pick up some PRN (as-needed) work hours while her applications were pending. (Def.s' S.M.F. ¶ 57.) Ms. Rose also stated in her March 16 email to Ms. Letellier: "I miss the OR and an old house is expensive to fix up so I thought this would be a good way to accomplish both missions." (Def.s' S.M.F. ¶ 58.) On March 16, Ms. Letellier responded to Ms. Rose that she (Ms. Letellier) was forwarding Ms. Rose's email requesting a return to the COR to Linda DiPalmo, who at the time was the Interim OR Manager, as Ms. DiPalmo had primary staffing responsibilities for the COR. (Def.s' S.M.F. ¶ 59; Pl.'s S.A.M.F. ¶ 233.)

Also on March 16, Ms. Letellier instructed Ms. DiPalmo to follow up with Ms. Rose about her interest in returning to the department. (Def.s' S.M.F. ¶ 61.) Ms. DiPalmo did in fact communicate with Ms. Rose about her interest in returning to the COR. (Def.s' S.M.F. ¶ 62.) On March 21, Ms. DiPalmo forwarded Ms. Letellier an email that Ms. Rose had sent to her (DiPalmo) on March 20. (Def.s' S.M.F. ¶ 63.) In Ms. Rose's March 20 email to Ms. DiPalmo, as forwarded to Ms. Letellier, Ms. Rose stated how much she missed the COR and that she had "been an OR nurse most of my 25 year career and it's just what I do." (Def.s' S.M.F. ¶ 64.)

5

In this period, Ms. DiPalmo asked Gwen Ouellette how she felt about the possibility of Ms. Rose returning to the COR department. (Def.s' S.M.F. ¶ 65.) Ms. Ouellette told Ms. DiPalmo a resounding "no." (Def.s' S.M.F. ¶ 66.) Ms. Ouellette did not want Ms. Rose back in the COR unit due to her perception of how unreliable Ms. Rose had been, which had put a strain on the rest of the COR staff in terms of having to compensate for Ms. Rose's absence from shifts. (Def.s' S.M.F. ¶ 67.) Ms. Ouellette's concerns about Ms. Rose's reliability related to her work with Ms. Rose in 2013 and January of 2014, before Ms. Rose's injury. (Def.s' S.M.F. ¶ 68.) Ms. Ouellette's concerns about Ms. Rose's reliability had nothing to do with the fact that Ms. Rose had hurt her back in February of 2014. (Def.s' S.M.F. ¶ 69.) Ms. Ouellette never told Ms. DiPalmo anything related to Ms. Rose's February 2014 accident or her resulting back injury. (Def.s' S.M.F. ¶ 70.)

Ms. Rose disputes that any of Ms. Ouellette's concerns were valid. Ms. Rose had no history of discipline relating to being unreliable prior to her injury. (Pl.'s S.A.M.F. ¶ 235.) Ms. Ouellette never confronted Ms. Rose with accusations of being unreliable prior to her workplace injury. (Pl.'s S.A.M.F. ¶ 236.) Ms. Rose was never confronted by anyone or accused of being unreliable prior to her workplace injury. (Pl.'s S.A.M.F. ¶ 237.) After her injury, Ms. Rose had many absences from her work in the COR that EMMC knew were directly related to her workplace injury. (Pl.'s S.A.M.F. ¶ 238.)

Ms. Rose states that she was informed by Ms. DiPalmo that she had not been selected for a position in the COR because Ms. DiPalmo had "asked some people in the OR [about Ms. Rose] . . . and that she did not get favorable answers."[4] (Def.s' S.M.F. ¶ 71.) The parties dispute whether anything specifically was communicated to Ms. Rose.[5] (Def.s' S.M.F. ¶ 72; Pl.'s Denial to Def.s' S.M.F.

---

[4] It is not particularly clear from the parties' statements of material facts the date on which Ms. DiPalmo informed Ms. Rose that Ms. Rose was not being accepted back into the COR, but is apparent it happened sometime within the last week or so of March 2015 and the first week or so of April 2015.

[5] Defendants contend there is a clear contradiction between Ms. Rose's claim that Ms. DiPalmo told Ms. Rose that nurses in the COR Ms. Rose worked previously with said she was "unreliable," as well as Ms. Rose's claim that Ms. DiPalmo said Ms. Rose lacked "current practice," and her deposition testimony where she could not

6

¶ 72; Pl.'s S.A.M.F. ¶¶ 239, 241.) Nonetheless, Ms. Rose does not believe that Ms. DiPalmo was being truthful about having spoken to others in the COR about her. (Def.s' S.M.F. ¶¶ 73-74.) In an April 9 email to Ms. DiPalmo and Ms. Letellier, Ms. Rose stated: "I had some unfortunate things happen to me during my short time in the OR there that had some impact on my performance." (Def.s' S.M.F. ¶¶ 75-76.) Ms. Rose went on to state in her April 9 email that "It is unfortunate that some people you talked to had portrayed me in an unfavorable light as I'm sure unplanned family issues and illnesses have come up in everyone's life from time to time." (Def.s' S.M.F. ¶ 77.) After April 9, Ms. Letellier never heard from Ms. Rose or from any other source that Ms. Rose was continuing to pursue a position in the Perioperative Services Department. (Def.s' S.M.F. ¶ 78.)

Importantly, Ms. Rose did not communicate to any decisionmaker or anyone who needed to have such knowledge—other than by way of assertions she made in her affidavit in opposition to the motion for summary judgment that are discussed starting on page 17—that she wanted to return to the operating room because of her back issues. She never told Ms. Letellier during their communications in the spring of 2015 that she wanted to return to the Perioperative Services Department as a form of a reasonable accommodation for any injury or condition. (Def.s' S.M.F. ¶ 79.) Ms. Rose never requested any accommodation from Ms. Letellier in the spring of 2015 in connection to the Perioperative Services Department. (Def.s' S.M.F. ¶ 80.) Ms. Letellier never heard from any other source that Ms. Rose requested to return to the Perioperative Services Department as a form of a reasonable accommodation. (Def.s' S.M.F. ¶ 81.) To the contrary, Ms. Rose's communications to Ms. Letellier in the spring of 2015 indicated that her back had healed, that she was engaged in an active exercise regimen, and that she wanted to return to the Perioperative Services Department because she missed being in the COR. (Def.s' S.M.F. ¶ 82.) Further, Ms. Rose never

remember if Ms. DiPalmo told her specific reasons. The Court does not view this as a clear contradiction. *Cf. Brooks v. Lemieux*, 2017 ME 55, ¶ 17, 157 A.3d 798. Instead, it is clear the parties dispute this issue. Whether it is a material dispute is a different question.

7

told Ms. DiPalmo during their communications in the spring of 2015 that she wanted to return to the COR as a form of a reasonable accommodation for any injury or condition. (Def.s' S.M.F. ¶ 83.) Ms. Rose never requested any accommodation from Ms. DiPalmo in the spring of 2015 in connection to the COR. (Def.s' S.M.F. ¶ 84.) Ms. DiPalmo had not heard from any other source that Ms. Rose requested to return to the COR as a form of a reasonable accommodation. (Def.s' S.M.F. ¶ 85.)

David Zelz is an HR Business Partner for Eastern Maine Healthcare Systems, in which role he provides HR functions to EMMC and serves as the primary HR contact for approximately 1,200 of its employees. (Def.s' S.M.F. ¶ 86.) Mr. Zelz's regular job duties as an HR Business Partner for EMMC include receiving requests for disability accommodations and engaging in the interactive process with employees and their supervisors regarding such requests. (Def.s' S.M.F. ¶ 87.) Beginning in approximately February of 2015, Mr. Zelz began working on some HR related matters with Ms. Rose's supervisors in the CED, pertaining to Ms. Rose's role as a Staff Developer in that department. (Def.s' S.M.F. ¶ 88.) Given Mr. Zelz's work on HR matters related to Ms. Rose in the spring of 2015, had Ms. Rose made a request to transfer from the CED to another department within EMMC as a form of a disability accommodation, Mr. Zelz would have normally expected to have been made aware of such a request. (Def.s' S.M.F. ¶ 89.) Mr. Zelz has no recollection of ever being informed from any source that Ms. Rose sought a transfer from the CED to the COR as a form of an accommodation. (Def.s' S.M.F. ¶ 90.)

### 3. Facts Related to Ms. Rose's Claims against Acadia.

In the spring of 2015, Acadia, a psychiatric hospital in Bangor, specializing in the treatment of mental illnesses and substance abuse, posted an open position for a "Psych RN II" within its pediatric service unit. (Def.s' S.M.F. ¶¶ 92-93.) The position was initially scheduled as a full-time regular 36-hour per week position on the day shift, consisting of four nine-hour shifts per week from 6:00 a.m. to 3:30 p.m. (Def.s' S.M.F. ¶ 94.) Ms. Rose applied for the Psych RN II position on or about March

8

26. (Def.s' S.M.F. ¶ 95.)

Wendy Hughes (f/k/a Niles) was the Nurse Manager in charge of that position, and in that role, Ms. Hughes was in charge of determining the scheduling of the position, reviewing applications, interviewing candidates, and making hiring decisions. (Def.s' S.M.F. ¶ 96.) Ms. Hughes and Barbara Turner, a recruiter for EMHS, interviewed Ms. Rose shortly after she applied. (Def.s' S.M.F. ¶ 97.) Ms. Hughes and Ms. Turner were favorably impressed with Ms. Rose, and Ms. Hughes was interested in Ms. Rose for the position. (Def.s' S.M.F. ¶ 98.) Around March 31, Ms. Hughes decided to offer the position to Ms. Rose at the pay rate of $29.847 per hour, contingent on Ms. Rose passing a pre-placement physical examination. (Def.s' S.M.F. ¶ 99.) Ms. Hughes's decision in that regard was authorized by David Wheaton, HR Business Partner for Acadia. (Def.s' S.M.F. ¶ 100.) Ms. Hughes instructed Ms. Turner to call Ms. Rose and to offer her the position on the above-referenced terms. (Def.s' S.M.F. ¶ 101.) Shortly thereafter, Ms. Turner informed Ms. Hughes and Mr. Wheaton that Ms. Rose declined the offer due to dissatisfaction with the pay. (Def.s' S.M.F. ¶ 102.)

Around April 9, Ms. Turner informed Ms. Hughes and Mr. Wheaton that Ms. Rose was reconsidering her declination of the offer, and that Ms. Rose wanted to know if they could either increase the rate of pay or, alternatively, make it a 40-hour per week position. (Def.s' S.M.F. ¶ 103.) Based on that communication, Ms. Hughes agreed to make the position a 40-hour per week position, with the new schedule being four shifts per week of ten hours each, from 6:00 a.m. to 4:30 p.m. (Def.s' S.M.F. ¶ 104.) Around April 10, Ms. Turner informed Ms. Hughes and Mr. Wheaton that Ms. Rose still could not accept the Psych RN II position due to the pay. (Def.s' S.M.F. ¶ 105.) In order to recruit Ms. Rose, Ms. Hughes requested, and Mr. Wheaton authorized, an increase in the pay to $32.00 per hour. (Def.s' S.M.F. ¶ 106.) Ms. Hughes instructed Ms. Turner to extend an offer to Ms. Rose for the position at the new rate, again contingent on her passing a pre-placement physical examination. (Def.s' S.M.F. ¶ 107.) Ms. Hughes and Mr. Wheaton were informed on April 14 that Ms. Rose had

9

accepted that offer. (Def.s' S.M.F. ¶ 108.) Ms. Rose's offer was contingent on her passing a pre-placement physical examination to ensure that she could adequately perform the essential functions of the job, either with or without reasonable accommodations. (Def.s' S.M.F. ¶ 109.)

Ms. Rose had her pre-placement physical examination with Howard J. Jones, MD, on or about April 28. (Def.s' S.M.F. ¶ 110.) On or about April 30, Ms. Hughes and Mr. Wheaton received a copy of Dr. Jones's "Assessment After Post-Offer Medical Evaluation" pertaining to Ms. Rose. (Def.s' S.M.F. ¶ 111.) Dr. Jones's evaluation states that Ms. Rose was "[a]pproved to perform the essential physical demands of the position if the following accommodations can be made: no patient restraints." (Def.s' S.M.F. ¶ 112.) The ability to perform patient restraints, whenever necessary, is an essential function of the Psych RN II position.[6] (Def.s' S.M.F. ¶ 113.) Acadia's patient population includes people who suffer from various forms of mental illnesses as well as people who may be under the influence of drugs and/or alcohol (or who may be experiencing withdrawal from such substances). (Def.s' S.M.F. ¶ 114.) Patients in those populations can, and sometimes do, become agitated and combative and pose a threat of physical harm to themselves, other patients and staff members. (Def.s' S.M.F. ¶ 115.) Acadia thus trains certain categories of personnel, including the Psych RN II position, on how to safely and appropriately restrain patients in those types of situations. (Def.s' S.M.F. ¶ 116.) Because it is not possible to know ahead of time when a patient may need to be restrained, it is imperative for trained Acadia personnel to be able to perform restraints whenever the need may arise. (Def.s' S.M.F. ¶ 117.) Ms. Rose's purported inability to perform patient restraints meant that she

---

[6] Ms. Rose attempted to qualify this fact on the basis of the assertion that doing patient restraints would have been an essential function in the long term, but not for Ms. Rose's initial first weeks on the job when she was training. (Pl.'s Qual. to Def.s' S.M.F. ¶ 113; Pl.'s S.A.M.F. ¶ 250.) Defendants objected to Ms. Rose's assertion because she had not established any foundation to support it. The Court agrees that Ms. Rose did not establish any foundation to support this assertion. Even if she had established a foundational basis for this assertion, it does not change the substance of what Acadia believed to be true at the time based on what it received from Dr. Jones: without any temporal limitation included as a qualifier, she could not do patient restraints.

10

could not perform an essential function of the position.[7] (Def.s' S.M.F. ¶ 118.)

On April 30, based on Dr. Jones's medical assessment that Ms. Rose could not perform patient restraints, Acadia sent Ms. Rose an email withdrawing her conditional offer shortly after receiving his evaluation. (Def.s' S.M.F. ¶ 119; Pl.'s S.A.M.F. ¶ 254.) Then, on May 4, Ms. Rose emailed Mr. Wheaton and Ms. Turner to indicate that she had gone back to see Dr. Jones after the offer was rescinded, and, after she explained the situation to him (Dr. Jones), he specified a limited period of restriction and agreed to re-evaluate her the following week. (Def.s' S.M.F. ¶ 120; Pl.'s S.A.M.F. ¶¶ 256-257.) She sought reconsideration of the withdrawal of the job offer. (Pl.'s S.A.M.F. ¶ 259.) Ms. Rose's May 4 email to Mr. Wheaton included as an attachment a hand-written note from Dr. Jones, which stated: "Kelda is being treated for a medical condition which will require a limited period of activity restriction she will [sic] re-evaluated 5/11 and I expect modification at this time." (Def.s' S.M.F. ¶ 121; Pl.'s S.A.M.F. ¶ 258.) Dr. Jones's note of May 4 made no mention of Ms. Rose's ability to perform patient restraints in the interim between May 4 and May 11. (Def.s' S.M.F. ¶ 122.) While Dr. Jones's note indicated that he "expect[ed] modification" following the re-evaluation, he did not state anything with respect to her ability to perform patient restraints nor did he provide any information about what the "expect[ed] modification" might be. (Def.s' S.M.F. ¶ 123.) Thus, Mr. Wheaton made the determination that Dr. Jones's note of May 4 did not provide enough information to determine whether or not Ms. Rose could perform the essential function of the position either with or without reasonable accommodation, either as of May 4 or any date thereafter.[8] (Def.s' S.M.F. ¶

---

[7] Ms. Rose attempted to qualify this fact for the same reason discussed in footnote 6. Again, Dr. Jones's assessment did not convey to Acadia that there was any sort of limited duration to her inability to perform patient restraints. The undisputed facts demonstrate that, as far as Acadia knew in the immediate aftermath of Dr. Jones's assessment, Ms. Rose could not perform patient restraints.

[8] Ms. Rose attempted to deny this fact based on a combination of propositions without record citations, inadmissible hearsay, and assertions that do not controvert the substance of Mr. Wheaton's personal conclusion that the May 4 note lacked enough information. The fact is deemed admitted. *See* M.R. Civ. P. 56(h)(4).

124.) Dr. Jones lifted all of Ms. Rose's restrictions on May 11. (Pl.'s S.A.M.F. ¶ 260.)

Around May 5, Ms. Hughes decided to move the open Psych RN II position from the day shift to the evening shift due to her judgment that there was a greater need for coverage on that shift. (Def.s' S.M.F. ¶ 125.) Ms. Hughes informed Mr. Wheaton by email on May 5 of her decision to change the position to the evening shift. (Def.s' S.M.F. ¶ 126.) During her original interview for the Acadia position, Ms. Rose had made it clear that she would only be able to work the day shift because she lived in a household with the children of her then-boyfriend to whom she needed to attend— children who resided with her then-boyfriend on a roughly 50/50 basis. (Pl.'s S.A.M.F. ¶ 261; Def.s' Qual. to Pl.'s S.A.M.F. ¶ 261.) Ms. Hughes changed this position from the day shift to the evening shift only one day after Ms. Rose returned with her May 4 note, which stated that her condition would only last for a "limited period," that she would be "re-evaluated [on] 5/11," and that he expected further modifications at that time; Ms. Hughes was unaware of the May 4 note when she made the decision to change the shift. (Pl.'s S.A.M.F. ¶ 263; Def.s' Qual. to Pl.'s S.A.M.F. ¶ 263.) However, as of May 11, Acadia continued to advertise for the job as a day position. (Pl.'s S.A.M.F. ¶ 264.)

While the job was advertised as a day position until May 11, on May 6 at 7:57 a.m., Ms. Turner emailed Ms. Hughes to indicate that she (Ms. Turner) had re-activated the posting for the Psych RN II; Ms. Hughes informed Ms. Turner that the position had been changed from the day shift to the evening shift. (Def.s' S.M.F. ¶ 127.) Ms. Hughes was under the impression that Ms. Turner would immediately cancel the position that Ms. Rose had applied for and that she would re-post it to reflect the change in shift. (Def.s' S.M.F. ¶ 128.) Ms. Hughes's decision to change the Psych RN II position from the day shift to the evening shift, which ran from 1:00 p.m. to 10:30 p.m., was based solely on her business judgment as to the department's needs and had nothing whatsoever to do with Ms. Rose. (Def.s' S.M.F. ¶ 129; Pl.'s S.A.M.F. ¶ 262.) Mr. Wheaton played no role whatsoever in the decision to change the Psych RN II position from the day shift to the evening shift, as that decision was solely

12

made by Ms. Hughes. (Def.s' S.M.F. ¶ 130.) On May 11, Ms. Turner forwarded an email to Mr. Wheaton in which Ms. Rose indicated that she had been cleared of all restrictions, and attached a new "Assessment After Post-Offer Medical Evaluation" completed on May 11. (Def.s' S.M.F. ¶ 131.) May 11 was the first time that Mr. Wheaton became aware that Ms. Rose had been relieved of the restrictions on performing patient restraints. (Def.s' S.M.F. ¶ 132.)

Ms. Turner informed Mr. Wheaton on May 11 that Ms. Rose was still interested in the Psych RN II position, at which time Mr. Wheaton indicated that Ms. Hughes had changed it from a day shift to an evening shift position. (Def.s' S.M.F. ¶ 133.) Ms. Turner then acknowledged to Mr. Wheaton that she was aware Ms. Hughes had changed the hours, that she (Ms. Turner) had mistakenly forgotten to update the job posting, and that she (Ms. Turner) had just then cancelled and re-posted the position to reflect the correct shift schedule. (Def.s' S.M.F. ¶ 134.) Later on May 11, Mr. Wheaton communicated with Ms. Hughes the fact that Ms. Rose had been cleared of her restrictions, and inquired whether Ms. Hughes would be willing to re-extend the offer to Ms. Rose so long as Ms. Rose was willing to work the evening shift. (Def.s' S.M.F. ¶ 135.) Ms. Rose believed Ms. Hughes knew that Ms. Rose remained interested in the Acadia position after she had initially been rejected because Ms. Rose left Ms. Hughes a message regarding the position on May 1. (Pl.'s S.A.M.F. ¶ 268; Def.s' Qual. to Pl.'s S.A.M.F. ¶ 268.) Ms. Hughes agreed to re-extend the offer to Ms. Rose so long as she was willing to work the evening shift. (Def.s' S.M.F. ¶ 136.)

May 11 was the first time that Ms. Hughes learned that Ms. Rose wanted to be reconsidered for the Psych RN II position and that she had been released from any restrictions. (Def.s' S.M.F. ¶ 137.) On May 11, Mr. Wheaton called to re-extend the offer to Ms. Rose, albeit on the new schedule. (Def.s' S.M.F. ¶ 138.) Ms. Rose declined the position and told Mr. Wheaton that she could not accept it because she could not work the evening hours that the position required. (Def.s' S.M.F. ¶ 139.) Ms. Rose was the only candidate who was ever offered the Acadia position. (Pl.'s S.A.M.F. ¶ 267.)

13

4.    **Facts Related to Ms. Rose's Claims against the CED.**

On or about March 15, 2015, Sandra Benton began working as the Manager of the CED and in that role was Ms. Rose's immediate supervisor. (Def.s' S.M.F. ¶ 154.) Ms. Rose and EMMC spend a great portion of the statements of material fact disputing the circumstances of her performance in the CED. (Def.s' S.M.F. ¶¶ 140-151, 152-153, 155-157, 159, 161-163; Pl.'s Qual. to Def.s' S.M.F. ¶¶ 153, 155, 161, 163; Pl.'s Denial to Def.s' S.M.F. ¶ 152; Pl.'s S.A.M.F. ¶¶ 271-279, 283, 285-287; Def.s' Qual. to Pl.'s S.A.M.F. ¶¶ 271, 273, 279, 285-287.) These facts are relevant but not dispositive of the legal issues here.

On or about April 14, Ms. Rose sent Ms. Benton an email indicating that she (Ms. Rose) had applied for, been offered, and accepted a position at Acadia. (Def.s' S.M.F. ¶ 164.) In her April 14 email, Ms. Rose also asked Ms. Benton to approve her transfer with a last day of May 3 so that Ms. Rose could attend Acadia's orientation that had been scheduled for May 4. (Def.s' S.M.F. ¶ 165.) In her email, Ms. Rose stated, "Having already had an ergonomic evaluation, there really isn't a workable solution relative to the demands of the workload and subsequent sitting for an extended period of time. Knowing this expectation isn't likely to change, I decided this sitting trigger warrants a change in position that is more accommodating and flexible to my physical needs. I applied for a position at Acadia hospital that is a better physical fit for me. I have been offered the position and have accepted it." (Def.s' S.M.F. ¶ 209.) Ms. Benton considered Ms. Rose's April 14 email a resignation of her position as a Staff Developer within the EMMC CED.[9] (Def.s' S.M.F. ¶ 166.) Ms. Benton responded to Ms. Rose via email on April 14 indicating that she approved Ms. Rose's request to leave the CED

---

[9] Ms. Rose disputes that she resigned and instead contends she was transferring from the Staff Developer position at EMMC to the Psych RN position at Acadia, even though EMMC and Acadia are separate entities under the Eastern Maine Healthcare System d/b/a Northern Light Health umbrella. (Pl.'s S.A.M.F. ¶¶ 315-317, 319, 333.) Defendants dispute Ms. Rose's contention that she could even functionally "transfer" from a position at EMMC to a position at Acadia. (Def.s' Qual. to Pl.'s S.A.M.F. ¶¶ 315-317, 319, 333.) The Court will discuss the resignation/transfer issue in more detail in the legal analysis section of the decision.

14

so that she could start her new job with Acadia Hospital. (Def.s' S.M.F. ¶ 167.)

Then, around April 30, Ms. Rose texted Ms. Benton indicating that her new position at Acadia required the use of restraints, which she was not able to perform, and as such the job offer at Acadia had fallen through. (Def.s' S.M.F. ¶ 169.) As part of that text message, Ms. Rose also asked Ms. Benton to rescind her earlier request that she had made on April 14 and to return to her position in the EMMC CED. (Def.s' S.M.F. ¶ 170.) Ms. Benton told Ms. Rose that she would "think about" allowing her to return to the Staff Developer position and would let her know. (Pl.'s S.A.M.F. ¶ 270.)

In the weeks following Ms. Rose's notification to Ms. Benton on April 14, that she had accepted a position at Acadia Hospital, Ms. Benton and the department discovered what they believed to be a number of performance failures and shortcomings on the part of Ms. Rose. (Def.s' S.M.F. ¶ 172.) Specifically, EMMC contends that Ms. Benton and Ms. Ryan learned that Ms. Rose had not completed a number of tasks that had been assigned to her during her tenure as Staff Developer. (Def.s' S.M.F. ¶¶ 173-199.) Ms. Rose contends that she did complete some portion of these projects, that she asked for help she never received on them, and, vaguely, that she kept Ms. Benton updated on the status of some of these projects. (Pl.'s S.A.M.F. ¶¶ 271-314.) Ms. Benton ultimately decided not to allow Ms. Rose to rescind her prior notice that she was leaving the CED, and she informed Ms. Rose of this on May 8, 2015. (Def.s' S.M.F. ¶ 205.)

At the same time she was attempting to return to the CED, around May 1, Ms. Rose applied for a position as a Primary Care Team Nurse with EMMC's Husson Family Medicine practice. (Def.s' S.M.F. ¶ 212.) After interviewing Ms. Rose, EMMC offered her that position. (Def.s' S.M.F. ¶ 213.) Ms. Rose agreed to start working in her position as Primary Care Team Nurse at the Husson Family Medicine Practice effective June 15. (Def.s' S.M.F. ¶ 214.) Ms. Rose did in fact work as a Primary Care Team Nurse at Husson Family Medicine Practice until October of 2015, at which time she left for personal reasons unrelated to her employment. (Def.s' S.M.F. ¶ 215.) Ms. Rose's employer during

15

her entire tenure with Husson Family Medicine was EMMC. (Def.s' S.M.F. ¶ 216.)

## LEGAL STANDARD

Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774. When reviewing the record on a motion for summary judgment, a court views the facts in the light most favorable to the non-moving party. *See Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 7, 129 A.3d 944. "Any doubt on this score will be resolved against the movant, and the opposing party will be given the benefit of any inferences which might reasonably be drawn from the evidence." 3 Harvey & Merritt, *Maine Civil Practice* § 56:6 at 242 (3d, 2018- 2019 ed. 2018).

## ANALYSIS

Employers "may not discriminate against a qualified individual with a disability because of the disability of the individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training and other terms, conditions and privileges of employment." 5 M.R.S. § 4572(2). An employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" is also a form of discrimination. *Id.* § 4553(2)(E).

When presented with a motion for summary judgment in an employment discrimination case, the Court must engage in—and the parties must present evidence supporting—a three-step, burden shifting analysis. *Carnicella v. Mercy Hosp.*, 2017 ME 161, ¶ 16, 168 A.3d 768. "[A]n employee must first establish a prima facie case that (1) [s]he has a disability; (2) [s]he is otherwise qualified, with or without reasonable accommodations, to perform the essential functions of [her] job; and (3)

16

[her] employer adversely treated [her] based in whole or in part on [her] disability." *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 14, 45 A.3d 722. "If the employee produces prima facie evidence of each element, the burden shifts to the employer to establish that it had a legitimate, nondiscriminatory basis for its actions; if the employer does so, 'the burden shifts back to the employee to produce evidence that the employer's proffered reason is a pretext to conceal an unlawful reason for the adverse employment action.'" *Carnicella*, 2017 ME 161, ¶ 16, 168 A.3d 768 (quoting *Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶ 15, 66 A.3d 7).

To state a claim for disability discrimination based upon a failure to accommodate, a plaintiff must show that: (1) she is a person with a disability pursuant to statute; (2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) that the employer knew of her disability but did not reasonably accommodate it upon plaintiff's request. *See Morissette v. Cote Corp.*, 190 F. Supp. 3d 193, 210 (D. Me. 2016); *Maloney v. Maine General*, No. CV-13-5, 2014 Me. Super. LEXIS 25, at *9 (Feb. 18, 2014). The law does not "affirmatively and independently establish a duty on an employer to identify reasonable accommodations for a disabled employee." *Carnicella*, 2017 ME 161, ¶ 24, 168 A.3d 768.

**1.    Ms. Rose's claims regarding the COR.**

Ms. Rose contends that EMMC's decision to not allow her to return to work in the COR in March 2015 was an act of disability discrimination, including a failure to reasonably accommodate her disability. She contends there are material facts in dispute regarding EMMC's decision to not return her to the COR upon her request. Ms. Rose's claimed factual disputes regarding EMMC's refusal to allow her to transfer back into the COR rely heavily on statements in her affidavit. In her affidavit, she states, for the first time, that (1) she told each of Ms. Letellier, Ms. DiPalmo, and Mr. Zelz that she wanted to come back to the COR position in part because she found the staff developer position difficult given her disability, and (2) she explained to Ms. Letellier, Ms. DiPalmo, and Mr. Zelz that

17

the COR position would give her a better opportunity to change positions and to stand while working. (Pl.'s S.A.M.F. ¶¶ 243-244, 247, 342; Rose Aff. ¶¶ 28-29, 32.)

The provision of this new information in opposition to the motion drew objection from Acadia and EMMC based on the rule that provides, "[w]hen an interested witness has given clear answers to unambiguous questions, [s]he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Zip Lube v. Coastal Sav. Bank*, 1998 ME 81, ¶ 10, 709 A.2d 733. Acadia and EMMC pointed, in part, to more than fifteen pages of Ms. Rose's deposition in which they sought to have Ms. Rose provide intricate detail on her conversations with Ms. Letellier and Ms. DiPalmo. In her deposition, Ms. Rose never indicated that she told either Ms. Letellier or Ms. DiPalmo that she wished to return to the COR for any reason relating to her back issues. Nor did she ever reference Mr. Zelz as someone she spoke with in HR regarding job issues, even though she was directly asked with whom in HR she spoke. Further, Acadia and EMMC pointed to emails sent to Ms. Letellier by Ms. Rose in conjunction with her request to move back to the COR. In these emails, Ms. Rose described her back as being fully healed, said she had been released from Workers' Compensation to unrestricted duty, was running three miles a day while also doing yoga and barre pilates, and was going to soon join a martial arts program. Based on these foregoing facts, Acadia and EMMC contend Ms. Rose is simply attempting to defeat a meritorious motion for summary judgment by manufacturing a factual dispute through the use of an affidavit.

It is not irrefutable that the affidavit clearly contradicts her deposition testimony. *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 26 (1st Cir. 2002) ("A subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment."). Were this all upon which Acadia and EMMC based their objection, the Court might be hesitant to disregard the subject portions of Ms. Rose's affidavit.

18

Acadia and EMMC supplied more, though.

In their interrogatories to Ms. Rose, Acadia and EMMC requested that she relate in detail each communication she had with Ms. Letellier and Ms. DiPalmo between December 1, 2014, and October 31, 2015. Ms. Rose directed Acadia and EMMC to her submissions to the Maine Human Rights Commission. In her submissions to the Maine Human Rights Commission, Ms. Rose did not list any communication in which she told Ms. Letellier or Ms. DiPalmo that she wanted to return to the COR due to her back issues. Further, Acadia and EMMC submitted an interrogatory to Ms. Rose asking her to identify each person who had knowledge of her claims. She did not list Mr. Zelz.

Through these interrogatories, to which Ms. Rose's responses were sworn under oath, Acadia and EMMC unambiguously sought disclosure of the information Ms. Rose only now supplied in her affidavit in opposition to the motion for summary judgment. Ms. Rose has not offered any explanation regarding why the existence of these facts was not disclosed in all her deposition testimony or interrogatory answers calling for this information. This cannot be countenanced, and the Court disregards this newly supplied evidence. *See Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101, ¶ 33, 980 A.2d 1270 ("In this case, the father-in-law's role as a potential source of redevelopment funds fell squarely within the scope of the discovery questions posed by CKF that unambiguously sought disclosure of all individuals and communications relevant to the issue of redevelopment financing. In this circumstance, the court properly treated the late disclosure of the father-in-law's evidence as contradictory to Kampf's earlier deposition and interrogatory responses."). Any of Ms. Rose's statements of additional material fact and any denials of Acadia and EMMC's statements of material fact that rely on paragraphs 28, 29, or 32 of her affidavit are disregarded.

What is left in the record demonstrates that there are no genuine disputes of material fact regarding EMMC's decision not to transfer Ms. Rose back to the COR. The undisputed record shows that Ms. Rose never communicated to any relevant individual that she wanted to go back to the COR

19

because it would be an accommodation for her back. Instead, Ms. Rose communicated that her back was fully healed, that she was released from Workers' Compensation to unrestricted duty, and she was engaging in vigorous physical activity. At the time Ms. Rose contends she was requesting a transfer to the COR due to her back, she was giving personal fulfillment reasons to the decisionmakers for wanting to go back to the COR. She told Ms. Letellier that her "passion . . . has always been for the operating room"; "you can take the girl out of the OR but you can't take the OR out of the girl! I'm back on my game and really want to get back either to cardiac or one of the assistant nurse manager of a service line position. Either way, I know I thrive best within the walls of an operating room"; and "I miss the OR and an old house is expensive to fix up so I thought this would be a good way to accomplish both missions." She also told Ms. DiPalmo how much she missed the OR and that she had "been an OR nurse most of my 25 year career and it's just what I do."

An "essential element" of Ms. Rose's burden in a reasonable accommodation claim is demonstrating "that she . . . sufficiently requested the accommodation in question." *Reed v. Lepage Bakeries, Inc.*, 244 F.3d 254, 260 (1st Cir. 2001). The employee must make a "sufficiently direct and specific" request for an accommodation that, "[a]t the least, . . . explain[s] how the accommodation requested is linked to some disability. The employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace." *Id.* at 261 (citations omitted). The undisputed evidence in the record demonstrates that Ms. Rose did not make any request for an accommodation, let alone a request for an accommodation due to her back injury. Instead, the record shows that her request to go back to the COR was due to her "passion . . . for the operating room." It is perplexing to think that EMMC could have even suspected that her requested return to the COR had anything to do with her disability when all of her documented contemporaneous communications either unambiguously conveyed to EMMC that the disability was no longer an issue or made no mention of it at all. As a matter of law, EMMC is entitled to summary

20

judgment on Ms. Rose's claim that EMMC failed to provide a reasonable accommodation for her disability when it did not transfer her back to the COR upon her request.

Further, the undisputed evidence in the record shows that this decision was not due to general disability discrimination. Ms. Rose contends there are too many disputed facts regarding pretext surrounding the decision not to allow her to return to the COR. (Pl.'s Opp. 8-9.) Yet, this contention assumes the existence of a prima facie case for her claim, presentation of which is her initial burden in opposing this properly supported motion for summary judgment. She has not put forth any evidence to support a prima facie case of disability discrimination in the COR.

As discussed above, in February and March of 2015, Ms. Rose sought to return to the COR and was in contact with both Ms. Letellier and Ms. DiPalmo. (Def.s' S.M.F. ¶¶ 47-59; Pl.'s S.A.M.F. ¶¶ 232-233.) In this period, Ms. DiPalmo asked Gwen Ouellette—who had worked with Ms. Rose in the COR in 2013 and 2014—how she felt about the possibility of Ms. Rose returning to the COR department. (Def.s' S.M.F. ¶¶ 2, 65.) Ms. Ouellette told Ms. DiPalmo a resounding "no." (Def.s' S.M.F. ¶ 66.) Ms. Ouellette did not want Ms. Rose back in the COR unit because of what Ms. Ouellette perceived to be Ms. Rose's unreliability, which had put a strain on the rest of the COR staff in terms of having to compensate for Ms. Rose's absence from shifts. (Def.s' S.M.F. ¶ 67.) Ms. Ouellette's concerns about Ms. Rose's reliability related to her work with Ms. Rose in 2013 and January of 2014, before Ms. Rose's injury.[10] (Def.s' S.M.F. ¶ 68.) Ms. Ouellette's concerns about Ms. Rose's reliability had nothing to do with the fact that Ms. Rose had hurt her back in February of 2014. (Def.s' S.M.F. ¶ 69.) Ms. Ouellette never told Ms. DiPalmo anything related to Ms. Rose's February 2014 accident or her resulting back injury. (Def.s' S.M.F. ¶ 70.)

Ms. DiPalmo then informed Ms. Rose that she had not been selected for a position in the

[10] Ms. Rose disputes that any of Ms. Ouellette's concerns were ever issues. (*See, e.g.*, Pl.'s S.A.M.F. ¶¶ 235-238.) Her contention that Ms. Ouellette's concerns were never issues is beside the point. What matters is what Ms. Ouellette perceived, and what of her perception she passed along to Ms. DiPalmo.

COR because Ms. DiPalmo had "asked some people in the OR [about Ms. Rose] . . . and that she did not get favorable answers." (Def.s' S.M.F. ¶ 71.) The parties dispute whether anything specifically was communicated to Ms. Rose. (Def.s' S.M.F. ¶ 72; Pl.'s Denial to Def.s' S.M.F. ¶ 72; Pl.'s S.A.M.F. ¶¶ 239, 241.) Nonetheless, Ms. Rose does not believe that Ms. DiPalmo was being truthful about having spoken to others in the COR about her. (Def.s' S.M.F. ¶¶ 73-74.)

Simply put, there is no evidence in the summary judgment record that would create a genuine dispute of material fact regarding the third element of Ms. Rose's prima facie case on the disability discrimination claim pertaining to the COR, namely that she was adversely treated due at least in part to her disability. Ms. Rose was required to produce prima facie evidence of adverse treatment due to her back injury, but she did not.[11] The summary judgment record demonstrates that she was not permitted to return to the COR because Ms. DiPalmo heard from Ms. Ouellette about her perception that Ms. Rose would not be a welcome addition back into the COR due to her leaving the department high and dry on a number of occasions in 2013 and 2014, before Ms. Rose's back injury. Ms. Ouellette undisputedly had extensive experience with Ms. Rose in the COR *before* Ms. Rose's back injury upon which she based her statements to Ms. DiPalmo.

Ms. Rose appears to try and generate an inference that she was adversely treated because of her back based on her assertion that Ms. DiPalmo told Ms. Rose that she was unable to return to the COR because the nurses with whom she had worked in the COR after her injury of February 5, 2014, had complained that she was "unreliable."[12] (Pl.'s S.A.M.F. ¶ 239.) There is no basis in the record to

---

[11] As discussed above, Ms. Rose instead was presenting herself as fully healed and capable of engaging in strenuous physical activity at the time she was seeking to return to the COR.

[12] Defendants contend there is a clear contradiction between Ms. Rose's claim that Ms. DiPalmo told Ms. Rose that nurses in the COR with whom she worked previously said she was "unreliable" after her back injury, as well as Ms. Rose's claim that Ms. DiPalmo said Ms. Rose lacked "current practice," and her deposition testimony where she could not remember if Ms. DiPalmo told her specific reasons. Regardless of the ostensible contradiction issue pointed out by Defendants, they make a particularly persuasive point that Ms. Rose conspicuously did not state that pre- and post-accident nurses with whom she worked in the COR were

22

conclude that any reference to information concerning unreliability had to have referred to post-injury unreliability. It would require a fact-finder to engage in substantial speculation to take only that vague and unspecific statement to find that Ms. Rose was not let back into the COR due at least in part to her disability. This is insufficient to withstand summary judgment. *See Holmes v. E. Me. Med. Ctr.*, 2019 ME 84, ¶ 15, 208 A.3d 792 ("[W]hen the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to a [summary] judgment." (Alteration in original)); *Estate of Smith v. Cumberland Cnty.*, 2013 ME 13, ¶ 19, 60 A.3d 759 ("In order to survive summary judgment, . . . the evidence must be sufficient to allow a fact-finder to make a factual determination without speculating."). Being that there are no genuine disputes of material fact, EMMC is entitled to summary judgment on Ms. Rose's claim that EMMC discriminated against her based at least in part on her disability when it did not transfer her back to the COR upon her request.

2.      **Ms. Rose's claims regarding Acadia.**

A "'qualified individual with a disability' means an individual with a physical or mental disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires."[13]  5 M.R.S. § 4553(8-D). It is the employee's burden to show that she is a qualified individual with a disability. *Carnicella*, 2017 ME 161, ¶ 19, 168 A.3d 768.   Determining whether an employee is "qualified" necessitates a review of potential reasonable accommodations. *Id.*  "'The analysis is generally broken into two steps: (1) whether the

---

different and would not have had experience with her before her injury to form opinions about her reliability. Notably, Ms. Ouellette worked with Ms. Rose in the COR both before and after Ms. Rose's injuries. (Def.s' S.M.F. ¶ 37; Pl.'s S.A.M.F. ¶ 228.)  Ms. Ouellette perceived a number of bases upon which Ms. Rose was unreliable before the February 5, 2014 injury, and Ms. Rose herself admitted to the truth of at least some of these bases. (Def's S.M.F. ¶¶ 5, 16, 35.)

[13] "Whether a task is an 'essential function' of a job is ordinarily a question of fact for the fact-finder." *Carnicella v. Mercy Hosp.*, 2017 ME 161, ¶ 20 n.5, 168 A.3d 768. Nonetheless, a fact-finder need not address that question in this case; the parties agree that the ability to perform patient restraints is an essential function of the position. (Def.s' S.M.F. ¶ 113; Pl.'s S.A.M.F. ¶ 250.)  Where the parties diverge is over the temporal circumstances of Ms. Rose's inability to perform patient restraints.

23

employee could perform the essential functions of the job; [and] (2) if not, whether any reasonable accommodation by the employer would enable [her] to perform those functions.'" *Id.* (quoting *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29, 33 (1st Cir. 2000)).

The circumstances of the original withdrawal of the Acadia position on April 30, 2015, present a circular application of the foregoing two-step analysis. It is undisputed that the ability to perform patient restraints is an essential function of the Psych RN II position. As was communicated by Dr. Jones to Acadia, Ms. Rose could do the job with one reasonable accommodation: "no patient restraints." In other words, the only reasonable accommodation that would permit Ms. Rose to perform the job was to be excused from performing an essential function of the position. Because the reasonable accommodation would not allow her to perform an essential function of the job, as of April 30, 2015, she could not perform the essential functions of the job. Therefore, she was not a "qualified individual with a disability." That being the situation, Ms. Rose has not established a prima facie case of disability discrimination regarding the withdrawal of the conditional offer of employment for the Acadia position on April 30.[14]

---

[14] The undisputed facts demonstrate that, as far as Acadia knew in the immediate aftermath of Dr. Jones's assessment, Ms. Rose could not perform patient restraints. Ms. Rose's statements of additional material fact 251 and 252—contending Dr. Jones told Ms. Rose that the restriction would be a temporary restriction for two weeks—rely on inadmissible hearsay statements from Dr. Jones to Ms. Rose. Ms. Rose is not seeking to use Dr. Jones's purported statements to demonstrate the effect they had on her; she is seeking to use them to establish that what he told her was true.

Most crucially, this purported two-week restriction was not contained in the official medical assessment Dr. Jones submitted to Acadia. Even disregarding the hearsay barrier with respect to Dr. Jones's alleged statements to Ms. Rose, Ms. Rose contends she told Mr. Wheaton about the temporary nature of the restriction. (Pl.'s S.A.M.F. ¶ 253.) Conspicuously absent from this assertion is the date on which Ms. Rose purportedly told Mr. Wheaton about the temporary nature of the restriction. The only evidence in the record of when Ms. Rose conveyed to Mr. Wheaton any potentially temporary nature of the restriction came on May 4, 2015—after Acadia withdrew the conditional offer of employment on April 30. (Pl.'s S.A.M.F. ¶¶ 254, 256.) Ms. Rose makes much of the May 4 note and her ultimate clearance on May 11 regarding her request that Acadia reconsider the withdrawal of the offer, but the fact remains that the conditional offer was withdrawn on April 30 because, as far as Acadia knew, Ms. Rose *could not* perform patient restraints and thus was not qualified for the position. That only changed on May 11, and, as the record demonstrates, Acadia did in fact reconsider and, on May 11, reextended her the offer for the position, which had been changed to the evening shift.

24

Ms. Rose then makes the peculiar contention that the act of reextending her the offer for the position (as the evening shift) on May 11 once she was cleared was an act of disability discrimination. She is highly suspicious of the timing of the May 4 letter from Dr. Jones, Ms. Hughes's May 5 business-judgment decision to change the position to an evening shift, the position still being advertised as a day position until May 11, and Ms. Rose's original statement to Acadia that she could only work the day shift. Ms. Rose takes the confluence of these facts to contend that Acadia only changed the position to an evening shift and reoffered it to her as soon as she was cleared because it "knew" she would not accept the position. This is a dubious contention, at best.

There is no evidence in the record to demonstrate that Ms. Hughes knew of Dr. Jones's May 4 letter when she decided to change the position to the evening shift. Additionally, the May 4 letter did not indicate Ms. Rose could then do patient restraints, therefore Ms. Rose was still not qualified for the position on May 5 when Ms. Hughes made the decision to change it to an evening shift. Because Ms. Rose was not qualified, Ms. Hughes's act of changing the position to an evening shift cannot be an adverse employment action. *See Carnicella*, 2017 ME 161, ¶ 16, 168 A.3d 768.

Most fundamental, however, is the fact that Ms. Rose's ostensible inability to work the evening shift had nothing to do with her disability. Her stated reason for not being able to work the evening shift was because she lived in a household with the children of her then-boyfriend to whom she needed to attend—children who resided with her then-boyfriend on a roughly 50/50 basis. (Pl.'s S.A.M.F. ¶ 261; Def.s' Qual. to Pl.'s S.A.M.F. ¶ 261.) Thus, it cannot be disability discrimination for an employer to offer a position it "knew" the applicant would not accept when the employer's "knowledge" of why the applicant would not accept had nothing to do with a disability. Moreover, there is a difference between not wanting to work evenings and being unable to work evenings. Because of the foregoing, Acadia is entitled to summary judgment on Ms. Rose's claims against it.

25

**3.     Ms. Rose's claims regarding the CED.**

Ms. Rose contends that she was discharged from her position as a Staff Developer in the CED when EMMC refused to return her to the position after the Acadia position fell through. She also contends this amounted to disability discrimination and a failure to provide a reasonable accommodation (based on a purported continuing duty to accommodate her). Ms. Rose's argument regarding her being discharged in May 2015 relies heavily on her contention that she was merely "transferring" from EMMC to Acadia, instead of "resigning" from EMMC and taking a new job at Acadia. As the Court sees it, whether what she was doing at the time was referred to as a "transfer" or a "resignation" is irrelevant. What matters is the substance of what was communicated to Ms. Benton on April 14, 2015, and the reason why she was not rehired or returned to the CED.

In her April 14 email to Ms. Benton informing her of Ms. Rose's decision to accept a position at Acadia, Ms. Rose stated, "Having already had an ergonomic evaluation, there really isn't a workable solution relative to the demands of the workload and subsequent sitting for an extended period of time. Knowing this expectation isn't likely to change, I decided this sitting trigger warrants a change in position that is more accommodating and flexible to my physical needs. I applied for a position at Acadia hospital that is a better physical fit for me. I have been offered the position and have accepted it." In other words, she communicated four crucial facts to Ms. Benton: (1) it was not possible to accommodate her in the CED (a department within EMMC); (2) she applied for a position at a different entity (Acadia); (3) she was offered the position and she accepted it; and (4) without placing any conditions on her departure, she was leaving the CED to work at Acadia. As the Law Court has said in the context of unemployment compensation,

> A resignation, when voluntary, is essentially an unconditional event the legal significance and finality of which cannot be altered by the measure of time between the employee's notice and the actual date of departure from the job. An employer who accepts an unequivocal notice of resignation from an employee is entitled to rely upon it, to the extent of preparing in one manner or another for the employee's

26

> absence, unless, of course, the employer chooses to return to *status quo* by rehiring the employee, or accepting a retraction of the notice.
>
> Absent such action by the employer, however, we are unable to say that a resignation matures only upon the final, physical exit of the worker from the job site. Were this the case, the employer would be unable to hire a replacement or otherwise adjust his work force except at his peril, subject to the wishes of an indecisive employee.

*Guy Gannett Publ'g Co. v. Me. Emp't Sec. Comm'n*, 317 A.2d 183, 187 (Me. 1974). EMMC was entitled to rely on Ms. Rose's April 14 email. While not dispositive, strikingly absent from the record is evidence of any attempted coordination between EMMC and Acadia that one might see if an employee were transferring from one department to another. Instead, what the record demonstrates is that she voluntarily left one job to take another. This can be nothing other than a resignation from her position in the CED, regardless of whatever terminology she used at the time.

Because she was never discharged from the CED, and instead left voluntarily, there was no adverse employment action when Ms. Benton declined to allow Ms. Rose to rescind her resignation.[15]

---

[15] Numerous federal courts have concluded or mused that not permitting an employee to rescind a resignation is not an adverse employment action in various employment disputes. *See, e.g., Wilkerson v. Springfield Pub. Sch. Dist. No. 186*, 40 F. App'x 260, 263 (7th Cir. 2002) (finding that the school district "was under no duty to allow Wilkerson to rescind his resignation after he submitted his signed resignation, turned in his keys, and stopped working" and that the defendant, therefore, "never took an adverse employment action against Wilkerson"); *Henneman v. Kitsap Cnty.*, No. C17-5066 RBL, 2018 U.S. Dist. LEXIS 123743, at *28 (W.D. Wash. July 24, 2018) ("Like the plaintiff in *Wooten[ v. Acme Steel Co.*, 986 F. Supp. 524 (N.D. Ill. 1997)], Henneman is not asking for a reasonable accommodation in his working conditions, but rather for a second chance at his job. Neither the ADA nor the WLAD contemplate reinstatement after quitting as a reasonable accommodation."); *Williams v. Rowan Univ.*, No. 10-6542 (RMB/AMD), 2014 U.S. Dist. LEXIS 171396, at *26 (D.N.J. Dec. 11, 2014) ("Refusing to rescind a resignation, absent a contractual or statutory duty to do so, is not an adverse employment action for the simple reason that the employment relationship has ended." (Quotation marks omitted)); *Cadet v. Deutsche Bank Sec. Inc.*, No. 11 Civ. 7964, 2013 U.S. Dist. LEXIS 87328 (S.D.N.Y. June 18, 2013); *Hammonds v. Hyundai Motor Mfg. Ala. L.L.C.*, No. 2:10–cv–103, 2011 U.S. Dist. LEXIS 69264, at *14 (M.D. Ala. June 28, 2011) ("So long as the resignation was voluntary and not a result of coercion or duress, there is no constructive discharge and the failure to accept rescission of a voluntary resignation is not an adverse employment action."); *Rutledge v. SunTrust Bank*, No. 8:05-CV-536-T27, 2007 U.S. Dist. LEXIS 12236, at *19 (M.D. Fla. Feb. 22, 2007) (finding that defendant's refusal to allow an employee to rescind a voluntary resignation is not an adverse employment action); *Beebe v. SwedishAmerican Hosp.*, No. 00 C 50017, 2001 U.S. Dist. LEXIS 15610, at *4 (N.D. Ill. Sep. 21, 2001) ("It is questionable whether a company's refusal to rescind a voluntary resignation could be considered an adverse employment action [under the ADA]."). The Court finds these conclusions persuasive in this context.

As there was no adverse employment action when Ms. Benton declined to allow Ms. Rose to rescind her resignation, Ms. Rose has not met her prima facie burden of employment discrimination as it pertains to her claims about returning to the CED.

On a final note, Ms. Rose contends EMMC improperly seeks to have its proverbial cake and eat it too. Specifically, Ms. Rose says that EMMC cannot argue both that there was no disability discrimination in February and March of 2015 when she tried to return to the COR because she was portraying herself as a model of health, but that—by her own admission in her email on April 14, 2015—"there really [wasn't] a workable solution" in the CED due to her disability, thus it cannot be disability discrimination not to allow her to go back to the CED in April and May of 2015 when the Acadia job fell through. Notwithstanding the temporal differences in when these events occurred, Ms. Rose has not pointed to any evidence in the summary judgment record to suggest that the CED in April and May of 2015 knew what Ms. Rose was saying to the COR in February and March of 2015, and vice versa.

In fact, it is Ms. Rose who seeks to have it both ways: she—by her own admission in her email on April 14, 2015—could not work in the CED because of her back as there were no "workable solution[s] relative to the demands of the workload and subsequent sitting for an extended period of time . . . [and] this sitting trigger warrants a change in position that is more accommodating and flexible to my physical needs." Undeterred, she contends she was denied an accommodation because of her disability when she was not let back into the CED just two weeks later. It is incongruous to contend that not allowing her to return to the CED was a failure to accommodate when she was saying at the time, without qualification, that working in the CED was not feasible because of her back. For that reason, even if the distinction between her departure from the CED being termed a "transfer" compared to a "resignation," it stretches the bounds of reasonableness to conclude anything but that it was not an act of disability discrimination not to return Ms. Rose to the CED just a few weeks after

28

Ms. Rose unequivocally asserted it was unaccommodating for her to work in the CED at all.

## CONCLUSION

As the foregoing demonstrates, there are no genuine disputes of material fact on any of Ms. Rose's claims in her complaint. Acadia and EMMC are entitled to judgment as a matter of law.

The entry is:

1. Acadia and EMMC's Motion for Summary Judgment is **GRANTED**, and Acadia and EMMC are awarded judgment as a matter of law on Kelda Sue Rose's Complaint.
2. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: 2/12/19

Hon. William R. Anderson
Justice, Maine Superior Court

29